UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GENELLE TRISCHLER,

     *Plaintiff*,               CASE NO. 2:14-CV-12867-PDB-PTM

*v*.

COMMISSIONER OF         DISTRICT JUDGE PAUL D. BORMAN
SOCIAL SECURITY,       MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S AMENDED REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the case be dismissed.

## II.    REPORT

### A.    Introduction and Procedural History

This case was referred to the undersigned to review the Commissioner's decision denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). *See* 28 U.S.C. §

---

[1] This Report was only amended to correct the first sentence's statement of the conclusion to bring it in accord with the remainder of the Report.

636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 12, 14.)

Genelle Trischler was thirty-seven years old at the time of the administrative hearing on January 30, 2013. (Transcript, Doc. 10 at 41, 139.) Plaintiff worked as an assistant manager in a retail store, a mental health technician, a receptionist, and a waitress before her alleged disability onset date. (Tr. at 153.) Plaintiff filed her claim for DIB on December 27, 2011, alleging that she became unable to work on September 21, 2009. (Tr. at 139.) The claim was denied at the initial administrative stage. (Tr. at 91.) In denying Plaintiff's claims, the Commissioner considered discogenic and degenerative disorders of the back, obesity, and other hyperalimentation. (*Id.*) On January 30, 2013, Plaintiff appeared before Administrative Law Judge ("ALJ") Kevin J. Detherage, who considered the application for benefits de novo. (Tr. at 41-79.) In a decision dated March 1, 2013, the ALJ found that Plaintiff was not disabled. (Tr. at 16-40.)

On May 23, 2014, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On July 22, 2014, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.     Standard of Review

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial

determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered de novo by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.     The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional

capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Title II, 42 U.S.C. §§ 401-434, provides DIB to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI, 42 U.S.C. §§ 1381-1385, provides Supplemental Security Income ("SSI") to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

4

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.     The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff met the insured status requirements through June 30, 2015, and had not engaged in substantial gainful activity since September 20, 2009, the alleged

onset date. (Tr. at 21.) At Step Two, he found that Plaintiff's conditions of "degenerative disc disease, obesity, depression, cervical spondylosis, right lower extremity peripheral polyneuropathy, bilateral radiculopathy, and right foot pain were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920. (*Id.*) At Step Three, he found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 22-24.) At Step Four, he found that Plaintiff could perform light, a limited range of unskilled and was unable to perform any past relevant work. (Tr. at 24-25, 34.) He also found that Plaintiff was thirty-three years old on the alleged onset date, putting her into the "younger individual" category. (Tr. at 64.) At Step Five the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, Plaintiff could perform a significant number of jobs in the national economy, and therefore she was not disabled. (Tr. at 34-35.)

### E.      Administrative Record

### 1.      Medical History

On September 20, 2009, Plaintiff was injured in a high speed motor vehicle collision. (Tr. at 240-43.) Her ankle was placed in a temporary splint and she was placed in a cervical collar and brought to Covenant HealthCare by ambulance. (Tr. at 350-53.) An x-ray of Plaintiff's spine showed "[m]ild degenerative disk disease at the C5-C6 level and "[n]o loss of alignment of the cervical spine [was] seen in the neutral, flexion and extension position." (Tr. at 223.) A CT of the right ankle showed

> (1) [c]omminuted and minimally displaced fracture of the medial malleolus.

(2) [s]mall avulsion fracture at the inferior margin of the sustentaculum tali.
(3) [s]uspected undisplaced hairline fracture along the medial aspect of the navicular.
(4) [e]xtensive circumferential soft tissue edema in the ankle and foot.

(Tr. at 224-25.) A CT scan of the chest, abdomen, and pelvis showed "[n]o evidence of acute traumatic injury," cholelithiasis, and left nephrolithiasis. (Tr. at 229.) A CT of the head was normal. (Tr. at 231.) A CT scan of the cervical spine showed no evidence of fractures and "[q]uestionable soft tissue density overlying the sternocleidomastoid" so that hemorrhage and contusion injury could not be ruled out. (Tr. at 232.) An x-ray of the right ankle showed a "[n]ondisplaced medial malleolar fracture." (Tr. at 234.) An x-ray of the lower leg showed a "[f]racture involving the medial mealleolus and the base of the 5th metatarsal bone" and "[m]inimal distortion of the ankle mortise." (Tr. at 235.) Plaintiff was assessed with "[m]ultiple right foot and ankle fractures." (Tr. at 241.) She was also diagnosed with an acute concussion and an acute contusion to the neck with a possible carotid injury. (Tr. at 353.) She was "placed in a well-padded posterior fiberglass splint," and was advised to return in about a week for possible casting. (Tr. at 241.) She was advised to remain non-weightbearing, and was prescribed a walker and Percocet. (*Id.*)

On October 19, 2009 Plaintiff transitioned into a CAM boot (Tr. at 561), and she continued using the boot and bearing weight as tolerated until January 2010. (Tr. at 549.) By May 11, 2010, Plaintiff was ambulating independently and using an "Aircast sport brace" on her right ankle. (*Id.*)

A September 23, 2009 note from Saginaw Valley Bone and Joint Center reads:

> P[atient] requests prescriptions for lift chair recliner, wheelchair, wheelchair ramp, toilet seat riser, [and] shower bar, stating her insurance told her 'sky's the limit' . . . . P[atient] currently has a walker and a roll about walker which she states will not roll over her carpeting. P[atient] states she has not been in contact with her case manager at State Farm to approve these items yet but her home medical agency . . . has given her ideas and brochures. [I] instructed P[atient] while reimbursement may be 'sky's the limit,' physician has responsibility of prescribing what is medically necessary only.

(Tr. at 571.) Another note from the same day in the same handwriting reads,

> [I] received call from Karen identifying herself as p[atient]'s case manager stating, "when I say sky's the limit, that's what I mean," I will be providing a list and if those things are not prescribed then we will change doctors." Karen then stated "you upset my daughter." Karen then identified "herself as p[atient]'s parent and case manager and disconnected phone."

(*Id.*)

Plaintiff received physical therapy from Hills & Dales General Hospital Center for Rehabilitation from December 16, 2009 to March 5, 2010. (Tr. at 247-349.) Most of the notes from these therapy sessions are illegible. (*Id.*) As of April 16, 2010, Plaintiff reported that she was about fifty percent better and the physical therapist opined that Plaintiff had "plateaued" and would not benefit from any more services. (Tr. at 258.)

On May 13, 2010, Plaintiff underwent a neuropsychological evaluation by Dr. William MacInnes at MidMichigan Neuropsychology Associates. (Tr. at 402-17.) She was referred because of her neck injury and symptoms of dizziness and nausea. (*Id.*) Plaintiff stated that she did not feel that her focus had been hindered by the accident and that her mind felt like it was "all there." (*Id.*) Pain frequently kept Plaintiff up at night, she had "brash, vivid nightmares," and she snored when she slept. (*Id.*) She denied a

history of learning disabilities or attention deficit disorder. (*Id.*) Plaintiff enjoyed "camping in the summer, going for . . . walks, shopping, and scrapbooking." (*Id.*)

Dr. MacInnes administered a battery of screening procedures. (Tr. at 403.) Throughout the testing, Plaintiff "was friendly, talkative, cooperative, and appeared to give a genuine effort on all tasks." (Tr. at 404.) Instructions occasionally had to be repeated or elaborated upon before Plaintiff fully understood them. (*Id.*) Dr. MacInnes made the following summary and recommendations:

> [Plaintiff's] performance on the neuropsychological evaluation [was] generally within normal limits for an individual her age. She [was] not experiencing significant cognitive deficits as a result of her accident; however, she d[id] appear to have a chronic pain disorder, which [was] having a negative impact on her mood and sleep hygiene. [Plaintiff was] reporting significant increases in her level of apathy; likewise her mother note[d] significant increases in her level of apathy and disinhibition. [Dr. MacInnes] suspect[ed] that her subjective occasional cognitive difficulties [we]re related to her sleep deprivation and disruption, chronic pain, and evolving mood disorder. [Plaintiff was] struggling emotionally with the fact she ha[d] not improved as much as she would have liked. [Dr. MacInnes] would strongly urge her to begin some individual counselling and/or group counselling regarding the psychological effects of chronic pain. . . . [Plaintiff] may also be a good candidate for the use of an energizing antidepressant medication [such as Lexapro]. . . . Likewise, [Plaintiff] may benefit from some alternative and/or additional therapies to work on her pain problems such as water aerobics, possibly massage therapy, etc. She does seem to be a willing candidate for additional therapy and [he was] optimistic she c[ould] benefit from these therapies.

(Tr. at 406.) His diagnostic impression was "1. Chronic pain disorder secondary to injuries from automobile accident. 2. Sleep disruption secondary to chronic pain. [And] 3. Organic mood disorder secondary to chronic pain and sleep disruption." (Tr. at 407.)

Plaintiff returned to MidMichigan for a few individual psychotherapy sessions in May and June 2010 and saw limited license psychologist Zigmond A. Kozicki. (Tr. at

409-12, 623-25.) He noted her "borderline" depression and vaguely observed, or perhaps recorded her self-report, that she "had some trouble thinking since the accident." (Tr. at 409.) She wore an ankle brace to her June 18, 2010 appointment. (Tr. at 412.)

A July 30, 2010 MRI of the cervical spine showed "[d]isc ostcophyte complex centrally causing slight compression of thecal sac at level C5-C6." (Tr. at 474-75.) An August 6, 2010 MRI of Plaintiff's right ankle showed: (1) an "[i]rregularity of the articular surface of the talus on the medial side adjacent to the medial malleolus, likely secondary to early ostcoarthritis or due to chronic stress. No osteochondral fracture is seen. No loose fragments are seen in the ankle. No effusion is seen in the ankle and subtalar joints"; and (2) "marrow edema in the cuboid and base of the fifth metatarsal on either side of the tarsometatarsal joint. There is also mild edema surrounding the peroneus longus tendon at this level. This part of the foot is not included in the field-of-view as the study is limited to the ankle exam." (Tr. at 436-37.) It was noted that Plaintiff had problems remaining still during the scanning "resulting in motion artifacts." (Tr. at 472.)

On November 19, 2010, Plaintiff received an independent medical evaluation for her right ankle from Dr. Jeffrey Lawley. (Tr. at 440-51.) She was five foot, nine inches tall and weighed 397 pounds. (*Id.*) She was wearing an ankle brace "on a nearly full-time basis." (*Id.*) She complained of "frequent pain and stiffness involving her right foot and ankle as well as her shoulder," which typically ranked as a five on a scale of one to ten. (*Id.*) She did not think she could stand or walk for more than twenty to thirty minutes before she would need to sit down and rest. (*Id.*) Her foot was almost always swollen,

which was aggravated by standing or walking. (*Id.*) Her neck pain was just as intense as her right foot pain. (*Id.*) Surprisingly, sitting aggravated her neck pain. (*Id.*) Ice, heat, and pain medications provided her temporary relief from her neck pain. (*Id.*) Plaintiff had full range of motion in all three planes on her neck. (*Id.*) "She had full active plantar flexion of her ankle; however, dorsiflexion was to -5 degrees." (*Id.*) She had "full subtalar joint range of motion with both inversion and eversion." (*Id.*) She "ambulated with a noticeable limp," and had "no difficulty toe walking; however, she did complain of difficulty with heel walking on her right side because of limited dorsiflexion." (Tr. at 445.) After reviewing her medical records and radiology reports, Dr. Lawley diagnosed her as follows:

1. Mild cervical spondylosis without neurological deficit, pre-existent condition.

2. Healed medial malleolus fracture right ankle with slight loss of terminal dorsiflexion.

3. Mild degenerative joint disease right ankle, pre-existent condition.

(Tr. at 445.)

Dr. Lawley opined that Plaintiff was not in need of any active medical treatment for her neck. (Tr. at 446.) She had full active range of motion, "a negative Spurling's maneuver, as well as intact neurological status," and her "x-rays showed minimal degenerative changes in her mid cervical spine . . . ." (*Id.*)  He further opined that Plaintiff could return to work "without restrictions or limitations for her neck." (*Id.*) With regard to Plaintiff's right foot and ankle, he found that Plaintiff had "a slight loss of terminal dorsiflexion, which has failed to improve with the treatment she has received to

date." (Tr. at 447.) He recommended "aggressive home exercise program as well as the use of a dynamic splint before considering surgical options as recommended by Dr. Danielle Duncan." (*Id.*) He reasoned that she only had "5 degree loss of dorsiflexion," and he did not consider that significant enough to merit surgery. (*Id.*) He opined that Plaintiff was capable of working with restrictions for her right foot and ankle—she would need to avoid continuous standing or walking, would not be able to climb, and would be able to lift no more than twenty pounds." (*Id.*) He also said "If her right ankle dorsiflexion does not improve with this conservative treatment, then I would suggest an Achilles tendon lengthening procedure as recommended by Dr. Duncan." (*Id.*) He also opined that Plaintiff had not "reached maximum medical improvement regarding her right foot/ankle injuries." (*Id.*)

Plaintiff saw Dr. Farruch Anwar from September 20, 2009 to January 5, 2011. (Tr. at 452-500.) On May 16, 2011 Plaintiff was progressing well overall, although she still had pain in her right ankle. (Tr. at 485-89.) Her neck had "significantly improved." (*Id.*) Dr. Anwar said that "[h]er functional capacity remain[ed] limited which appeared multifactorial related to patient's body aches and pains, depression and her weight." (*Id.*) Upon examination on August 23, 2011, Plaintiff's right ankle did not show any redness, swelling, or discoloration. (Tr. at 483-84.) Dr. Anwar's impression was "1. Chronic right ankle pain. 2. Automobile accident. 3. Essential hypertension. 4. Anxiety and depression." (*Id.*) He refilled her Cymbalta and Vicodin prescriptions. (*Id.*)

Plaintiff was treated at Saginaw Valley Bone and Joint Center from September 23, 2009 to September 27, 2011. (Tr. at 533-74.) On May 11, 2010, Dr. Duncan was not

convinced that the right ankle fracture had completely healed; she recommended Plaintiff use a brace with a lace-up shoe, crutch or can in her opposite hand, and to bear weight on her right ankle as tolerated. (Tr. at 548.) On May 19, 2011, Dr. Duncan recommended Plaintiff "consider ankle arthroscopy and Achilles lengthening" surgery. (Tr. at 535.) However, Dr. Duncan noted that she had not considered a neurological diagnosis of reflex sympathetic dystrophy/complex regional pain syndrome ("RSD/CRPS") before, and if Plaintiff did end up with such a diagnosis, any surgical intervention could increase her symptoms. (Tr. at 535-36.)

As of September 27, 2011 Plaintiff continued to wear an ankle brace for support. (Tr. at 533.) She was walking for exercise and attempting to lose weight. (*Id.*) There was mild ankle swelling and moderate tenderness anteriorly, but no numbness or hypersensitivity in her right foot or ankle. (*Id.*) At this appointment, Dr. Duncan had reconsidered her surgical intervention advice because she now believed RSD/CRPS was likely, and therefore that "bracing [was] her best option." (Tr. at 533.) She noted that Plaintiff's "footwear is showing significant wear." (Tr. at 533.) Dr. Duncan noted that elevation of her right leg helped reduce swelling. (Tr. at 535.)

Dr. Anwar referred Plaintiff to Dr. Karim Fram for a neurological evaluation, which was conducted on March 22, 2011. (Tr. at 583-85.) She complained about neck pain, back pain, leg pain, right ankle pain, problems sleeping because of pain, and headaches. (*Id.*) Upon examination she had tenderness over her lower cervical spine; tenderness in the lower lumbar spine; she was alert and oriented times three; her speech was fluent; her judgment, insight, and perception were normal; and her recent and remote

13

memory was normal. (*Id.*) There was limited dorsiflextion in her right foot, she had "decreased sensation to pinprick and light touch in the right foot and the distal part of the right leg," her gait was independent, she was unable to walk on her right heal, her tandem gait was impaired, and the Romberg test was negative. (*Id.*)

Dr. Fram's impression was "[c]losed head injury with post-traumatic headaches and post-concussion syndrome," and "[t]raumatic injury of the right lower extremity and right foot with swelling consistent with probable chronic regional pain syndrome (reflex sympathetic dystrophy) of the right foot." (*Id.*) He also found Plaintiff's medical record was consistent with "[b]ilateral S1 radiculopathy" and "[r]ight lower extremity peripheral polyneuropathy." (*Id.*) He found her neck pain was "probably secondary to cervical strain and possible radiculopathy." (*Id.*) He started Plaintiff on Neurontin and she was given instructions for at home neck, lower back, and muscle strengthening exercises, including daily walks as tolerated. (*Id.*)

Plaintiff went to Covenant Healthcare on April 26, 2011 for a follow up visit with Dr. Fram. (Tr. at 243-44.) She continued to have problems with intermittent headaches, but they had decreased with chiropractic treatment, she still had neck pain and stiffness with pain radiating to the right shoulder, and her right leg pain had not gotten any better. (*Id.*) The pain in her right foot became worse with mobility. (*Id.*) She was given a sciatic nerve block. (*Id.*) She was advised to continue neck, lower back, and muscle strengthening exercises at home, including daily walks as she was able to tolerate them. (*Id.*) She was to continue taking Neurontin. (*Id.*)

On May 9, 2011, Plaintiff had a foot and ankle bone scan. (Tr. at 501.) The impression was "[g]eneralized increased activity in the right midfoot and ankle and possible reflex sympathetic dystrophy cannot be excluded" and "[f]ocus of increased activity in the lateral right foot is more suggestive of possible trauma or arthritic changes and plain film radiographs are recommended." (*Id.*)

On August 30, 2011, Plaintiff followed up with Dr. Fram. (Tr. at 577-79.) The pain in her foot had not changed. (*Id.*) Her mental status examination was normal. (*Id.*) Her gait was independent but unsteady, she was unable to walk on the right heel, and her tandem gait was impaired. (*Id.*) On January 6, 2012, Plaintiff had another follow up visit with Dr. Fram. (Tr. 574-76.) She reported her headaches were intermittent but improving with chiropractic visits. (*Id.*) Her neck pain radiated into her right shoulder and increased with activity. (*Id.*) Her balance was poor because of her pain. (*Id.*) She continued to experience numbness and tingling in her foot. (*Id.*) She was alert and oriented times three, her speech was fluent, and her recent and remote memory function was normal. (*Id.*)

On May 24, 2011, Plaintiff saw Dr. Frank Greiffenstein for a neuropsychological consultation. (Tr. at 507-18.) She was five foot, nine inches tall and weighed 413 pounds. (Tr. at 512.) "She ambulated with a steady, narrow-based, and brisk gait. . . . I did not observe any physical distress while walking or sitting. I also did not observe any exaggerated pain behaviors." (*Id.*) "Her affect was bright but shallow. She seemed to speak with great relish about her many somatic symptoms. Her bright affect was

incongruent with her reported physical disability." (*Id.*) Dr. Greiffenstein was "unable to replicate Dr. MacInnes' finding of mildly weak grip strength." (Tr. at 514.)

After reviewing Plaintiff's medical records and administering several tests, Dr. Greiffenstein had the following impressions. He did not find any grounds for the conclusion that she sustained an "acute concussion" after the car accident on September 20, 2009. (Tr. at 515.) His findings supported "normal to superior memory and learning, average intelligence with commensurate academic achievement, normal psychomotor speed and vigilance, and normal to excellent cognitive skills to testing and interview." (*Id.*) He found "no objective evidence for cognitive impairment, even though [Plaintiff] reports widespread cognitive concerns on a subjective basis." (*Id.*) The clinical psychological component of his assessment "show[ed] that emotional factors probably explain[ed] her cognitive complaints. Interview and personality testing show[ed] strongly held illness conviction, overstatement of disability and physical dysfunction, pain sensitivity, feelings of inadequacy and inefficacy, and definite neuroticism." (*Id.*)

On September 13, 2011, Plaintiff received an independent medical examination from Dr. David J. Spiteri. (Tr. at 519-31.) She was bearing full weight on her right leg and she continued to wear an ankle brace. (Tr. at 520.) She was also ambulating without a cane because she did not like using it. (*Id.*) The range of motion of her cervical spine was intact. (Tr. at 523.) She was able to "evert and invert bilaterally and symmetrically without any significant discomfort." (*Id.*) She was limited "in some dorsiflexion involving the right foot about -5 degrees compared to that of the left, although her range of motion of the left with dorsiflexion also seem[ed] to be somewhat restricted." (*Id.*)

There was "no significant pain with palpitation of either ankle joint. No gross instability [was] appreciated on testing of either ankle joint. No guarding with palpitation of the ankle joint. [And] [t]here [was] no evidence of any sensitivity to light or medium touch in the region to suggest chronic regional pain syndrome." (Tr. at 523-24.)

After Dr. Spiteri reviewed Plaintiff's medical records, he concluded that there was no "clinical evidence that she has experienced" RSD/CRPS. (Tr. at 528.) He noted that two months after the September 20, 2009 accident Plaintiff was allowed to bear weight as tolerated on her right ankle. (Tr. at 529.) He did not believe that the "slight loss of dorsiflexion at the right ankle relative to the left side" resulted in "any significant disability or loss of function." (*Id.*) He pointed to the fact that she was ambulating without any assistive devices and was bearing weight as tolerated. (*Id.*) He also opined that "surgery would not change her current status." (*Id.*) In his opinion, Plaintiff would have needed assistance "with laundry, meal preparation, as well as yard work-type activities up until April 2010." (Tr. at 530.)

On January 16, 2012, Plaintiff followed up with Dr. Anwar. (Tr. at 720-21.) His impression from this visit was "1. Chronic pain/myofascial pain syndrome. 2. Obesity. 3. History of generalized anxiety and depression. 4. Rule out sleep apnea." (*Id.*) On April 30, 2012, Dr. Anwar added fibromyalgia to the list. (Tr. at 721.) On January 30, 2012, Plaintiff had an MRI of the lumbar spine. (Tr. at 589-90.) The impression was a "small left paracentral disc protrusion at L3-4 and a "mild right foraminal stenosis" at L4-5 and L5-S1. (*Id.*)

On May 23, 2012, Dr. Herbert Kushner completed a medical evaluation for Plaintiff. (Tr. at 593.) He concluded that RSD/CRPS was not a medically determinable impairment; her improving headaches were not severe; her concussion was not a medically determinable impairment; and that her obesity, foot, and ankle problems were severe impairments. (*Id.*) He also stated that Plaintiff's activities of daily living were very complete, which was inconsistent with the alleged severity of the pain. (*Id.*)

Dr. Duncan submitted a medical needs form for the Michigan Department of Human Services on March 1, 2012. (Tr. at 704-05.) Aside from listing her diagnoses, the form was blank. (*Id.*) On March 27, 2012, Plaintiff followed up with Dr. Duncan at Saginaw Valley Bone and Joint Center. (Tr. at 693-94.) At this time she was taking Cymbalta for depression and pain and Vicodin twice a day for pain. (*Id.*) Her ankle pain seemed to be getting worse in the last few weeks, so she asked about the possibility of being prescribed a cane and possibly a new brace. (*Id.*) Plaintiff was prescribed a cane, to be used "as needed." (*Id.*)

On April 16, 2012, Dr. Anwar completed a medical needs assessment of Plaintiff. (Tr. at 603-07.) He said that she had RSD/CRPS, chronic pain, and depression. (*Id.*) He also asserted that she would not be able to work any job and that her symptoms were "poss[ibly] life long." (*Id.*) He indicated that she could lift or carry ten pounds occasionally and could never carry twenty five pounds.[2] (*Id.*) Plaintiff could stand or

---

[2] Dr. Anwar placed x's indicating that Plaintiff could frequently carry 25 pounds and 50 pounds, but these appear to be crossed out. (Tr. at 603.)

walk at least two hours in an eight hour workday.[3] (*Id.*) Plaintiff would need assistance with mobility, dressing, shopping, laundry, and housework. (*Id.*) Dr. Anwar indicated that he was Plaintiff's primary medical provider. (*Id.*)

On, May 23, 2012, Dr. Herbert Kushner completed an RFC assessment of Plaintiff. (Tr. at 594-602.) His primary diagnosis was obesity and his secondary diagnosis was residual right foot/ankle fracture. (*Id.*) She could occasionally lift and/or carry up to twenty pounds, frequently lift and/or carry up to ten pounds, stand and/or walk for a total of at least two hours in an eight-hour workday, and sit for a total of about six hours in an eight-hour workday. (*Id.*) Her ability to push and/or pull was unlimited. (*Id.*) She could never climb ladders, ropes, or scaffolds; she could occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. (*Id.*) No manipulative, visual, or communicative limitations were established. (*Id.*) She was to avoid concentrated exposure to work hazards, such as machinery and heights. (*Id.*) He noted that RSD/CRPS was never established. (*Id.*)

Plaintiff followed up with Dr. Fram on April 17 and August 24, 2012. (Tr. at 706-15.) Her headaches, neck pain, and lower back pain were intermittent but improving with chiropractic treatment. (*Id.*) Her pain was not being controlled with her pain medications.

---

[3] Dr. Anwar also marked that Plaintiff could "[s]tand and/or walk less than 2 hours" during the workday. (Tr. at 603.) This potentially contradicts his selection of the next listed option, in which he indicated she could perform these tasks at least two hours per day. It seems that he intended to select each ascending option until reaching what he felt was Plaintiff's maximum standing and sitting ability. The boxes for "Lifting/Carrying" are selected in the same manner: he checked both that she could lift less than ten pounds and that she could lift ten pounds, and he marked that she could never carry over twenty-five pounds and that she could never lift over fifty pounds. (*Id.*)

(*Id.*) Treatment options "were discussed to include paravertebral nerve blocks." (*Id.*) A sciatic nerve block was administered on August 24. (*Id.*)

Dr. Fram completed an RFC assessment of Plaintiff on April 18, 2012. (Tr. at 748-49.) He diagnosed her with neck pain "secondary to disc protrusion," post-traumatic headaches, "back pain "secondary to radiculopathy," and a fourth item that is illegible. (Tr. at 748.) He did not think Plaintiff would be able to work—he was unsure for how long. (*Id.*) He said she could only lift less than ten pounds frequently, could only occasionally lift ten pounds, and could never lift greater than twenty-five pounds. (*Id.*) She could sit and stand "at least two hours in an eight hour workday. (*Id.*)

## 2.    Adult Function Reports

On January 10, 2012, Plaintiff completed an adult function report. (Tr. at 178-88.) Her conditions limited her ability to work as follows:

> Pain, swelling, stiffness in my right foot and ankle increasing when I am on feet. neck pain and muscle spasms in my back weaken without support. Headaches cause dizziness, nausea, vomiting. I have limited flexibility in my right foot, [A]chilles tendon, while any activity causes shooting pains from foot to lower back. Depression and anxiety create lack of focus/motivation mostly form pain.

(Tr. at 178 (sic throughout).) On a typical day she would "wake up and prepare breakfast and cold lunches for [her] daughters," sometimes she drove them to school, do "light housekeeping, rest, do paperwork, pay bills, watch tv, take a nap, maybe shower," run errands like grocery shopping or doctor appointments; after her daughters returned from school she would help them with their homework, make dinner, do laundry, watch television, and go to bed. (Tr. at 179.) With the help of her daughters and sometimes

from her mother, she also provided care for one dog and two birds. (*Id.*)  Before her injury she was able to "go up and down stairs without difficulty," walk without pain, work, lift heavier objects, sleep through the night, and be more social. (*Id.*) Plaintiff only cooked dinner a couple days a week. (Tr. at 180.)

Plaintiff's pain interfered with her sleep and she had nightmares that caused her to wake up screaming. (Tr. at 179.) She did not have problems with personal care and did not need reminders to take her medicine. (*Id.*) Plaintiff washed clothes and dishes, swept, mopped, dusted, and vacuumed; she spent about an hour to an hour and fifteen minutes a day doing housework. (Tr. at 180.) She needed help putting away laundry, going upstairs, moving out couches, washing the walls, mowing, raking, shoveling snow, and cleaning upstairs. (*Id.*) Some days, however, Plaintiff would not do housework because she would be in too much pain or be too depressed. (Tr. at 181.)

Plaintiff only reported going outside about two times a week: "[m]ost days I don't go anywhere[.] I don't like to drive [because] it causes anxiety. I don't really want to be in a crowd." (*Id.*) Her hobbies included watching television, couponing, spending time on Facebook, crosswords, scrabble, and camping. (Tr. at 182.) Before her injury, she also enjoyed playing tennis, walking, going to parks, and fishing. (*Id.*) She indicated that her condition caused problems lifting, squatting, bending, standing, reaching, walking sitting, kneeling, stair climbing, remembering, completing tasks, and concentrating. (Tr. at 183.) She could only walk for about thirty minutes before she would need about a thirty minute break, she could pay attention for about an hour, she did not finish things that she started, she could follow written instructions such as a recipe or toy assembly instructions, and

she could follow spoken instructions but sometimes would need things repeated. (Tr. at 183.) She got along well with authority figures, tried to avoid stress, sometimes when she was under stress she would get a headache or "want to scream," and she did not handle changes in routine easily, but felt she could "go with the flow." (Tr. at 184.) Plaintiff was prescribed an ankle brace in March, 2010, which she wore almost every day. (Tr. at 184.) She was taking Cymbalta, which caused dizziness, and Neurontin, which caused mood changes. (Tr. at 185.)

Plaintiff's mother, Karen Bazon, completed a third party adult function report on January 10, 2012, which largely mirrored Plaintiff's. (Tr. at 167-77.)

### 3.    Plaintiff's Testimony at Administrative Hearing

At the administrative hearing held on January 30, 2013, Plaintiff testified as follows. (Tr. at 41-72.) She had two daughters: one fourteen-year-old and one twelve-year-old. (*Id.*) Both children lived with her. (*Id.*) The last time she had worked was September 20, 2009, the day of her automobile accident. (Tr. at 45.) Her primary injury was a fractured right ankle. (Tr. at 47-48.) She continued to experience a "lot of numbness and tingling and burning," along with pain shooting up her right leg, sometimes into her lower right back. (*Id.*) She also suffered whiplash and continued to experience "persistent neck pain," and muscle stiffness and spasms. (*Id.*) After the accident, from September 2009 to May 2010, Plaintiff's mother came to her house every day to help her with household cleaning, chores, etc. (Tr. at 66-67.) From May 2010 to September 2012, her mother came three times per week to help; she had not been coming lately however because she was helping Plaintiff's grandfather in another state. (*Id.*)

At the time of the hearing, Plaintiff measured the pain in her ankle and in her neck as about a seven out of ten. (Tr. at 48-50.) She said Vicodin would bring it down as low as a four or five out of ten; she was taking Vicodin twice a day. (*Id.*) She was elevating her leg between four to six hours a day. (Tr. at 49.) She considered Dr. Anwar her primary care physician. (Tr. at 50.) She had a difficult time sleeping at night because of the pain—she estimated she only slept about five hours a night. (*Id.*) Her neck pain was somewhat relieved by chiropractic adjustments, which she received every two weeks. (Tr. at 51.) She also complained of back pain, which she measured as a five out of ten. (Tr. at 51-52.) The pain and neck muscle spasms made it difficult for her to concentrate. (Tr. at 53.)

Plaintiff estimated that the most she could lift was a gallon of milk. (*Id.*) She went grocery shopping for about thirty minutes every two weeks. (*Id.*) She was able to walk around the grocery store, but she relied upon the shopping cart to take some of the pressure off of her foot. (Tr. at 54.) She was able to stand, for example when she cooked dinner or washed dishes, but the pain became too excruciating after about forty-five minutes. (*Id.*) She was able to sit for about two hours before experiencing pain. (*Id.*) She often took a two hour nap during the day while her children were at school. (Tr. at 57.)

Plaintiff struggled with depression that she believed stemmed from dealing with her pain. (Tr. at 58.) She had just begun counseling the previous November and felt that it was helping her by allowing her to talk about living with pain every day. (*Id.*) She was seeing Dr. Trevor Grace approximately every two weeks. (*Id.*) She had a "crucial

problem with memory." (Tr. at 60.) She also had a problem maintaining attention and concentration. (*Id.*)

About three times a week Plaintiff developed headaches that lasted between two to six hours and were so bad that she would have to lie down. (Tr. at 62.) Her attorney asked her if she had been prescribed a cane after asking for one from Dr. Dunkin on March 27, 2012. (Tr. at 63-64.) Plaintiff testified that she had not asked about the cane and that Dr. Dunkin had recommended that she use it, because her "second MRI showed some wear and tear on the bone and [because of] the pressure." (*Id.*) She used the cane at home, but she did not like to take it outside because she became embarrassed. (*Id.*)

Plaintiff received a "right sciatic nerve block" from Dr. Fram on August 24, 2012, which provided no relief—she had received relief from an earlier pain block, however. (Tr. at 64-65.)

### 4.    Vocational Expert Testimony at Administrative Hearing

The vocational expert ("VE") testified as follows at the administrative hearing. (Tr. at 72-79.) She first noted that her testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. at 75.) The ALJ asked her to assume a hypothetical individual who shared Plaintiff's age, education, and work experience," and to "further assume . . . that the hypothetical individual has the residual functional capacity to do light work, which is unskilled; can occasionally stoop, kneel, crouch or crawl; can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs." (Tr. at 73-74.) The VE testified that the individual would not be able to perform any of Plaintiff's past work. (Tr. at 74.) However, the individual could do other work, such as machine tending with

approximately 7800 jobs available in Michigan, light assembly with approximately 14,000 jobs in Michigan, and counter clerking with approximately 14,900 jobs in Michigan. (*Id.*)

The ALJ then asked the VE to assume "that the hypothetical individual has an RFC to do light work, which is unskilled; again can occasionally stoop, kneel, crouch or crawl; can never climb ladders, ropes or scaffolds; can occasionally climb ramps or stairs; and in this case can stand or walk for two hours of a standard eight-hour workday." (Tr. at 74-75.) The individual would also not be able to do any of Plaintiff's past work, but would be able to do all of the above-listed jobs except the counter clerk would be reduced to approximately 7200 available positions for the region. (Tr. at 75.)

For the third hypothetical, the ALJ asked the VE to "assume the same as in hypothetical number two. In addition, the hypothetical individual should be allowed to elevate her right foot as necessary for two hours in a standard eight-hour work period." (Tr. at 76.) The VE said that there would be approximately 1800 security monitor positions and approximately 4600 information clerk positions in Michigan that the individual could perform. (Tr. at 76-77.) It would be work preclusive if the individual required four additional ten-minute breaks in the standard eight-hour work period. (Tr. at 77.)

Plaintiff's attorney asked the VE to assume the same individual as the second hypothetical, but with the following limitations:

> [B]eing unable to perform the tasks up to one-third of the time. Moderate limitations in the ability to maintain attention and concentration for extended periods in order to perform simple tasks; moderate limitation in

25

the ability to maintain attention and concentration for extended period in order to perform detailed tasks; and moderate limitation in the ability to perform a consistent pace without an unreasonable number of rest periods.

(Tr. at 77-78.) The VE said the individual would not be able to perform any of Plaintiff's past work or any job because he or she would be off task too much of the time. (Tr. at 77.)

### F.    Governing Law and Analysis

### 1.    Legal Standard

The ALJ determined that Plaintiff had the RFC

to perform light work as defined in 20 CFR 404.1567(b) except: the claimant is limited to unskilled work. She can occasionally stoop, kneel, crouch or crawl. She can never climb ladders, ropes or scaffolds. She can occasionally climb ramps or stairs. She can stand or walk for two hours of a standard eight hour workday. She should be allowed to elevate her right foot at any level necessary for two hours in a standard, eight-hour work period.

(Tr. at 24-25.) The regulations define light work as involving

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim.

I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.      Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545.

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

Plaintiff offers two arguments against the ALJ's decision. First, she disputes his analysis of the treating sources, particularly Dr. Anwar but apparently also Dr. Duncan. (Doc. 12 at 10-14.) Included in this argument is a litany of factual and legal errors the ALJ supposedly committed. In short, Plaintiff concludes, the "ALJ slanted and even outright misstates the evidence in his decision." (*Id.* at 14.) The next argument similarly cobbles together various strands to contend that the RFC is flawed. (*Id.* at 15-17.) Specifically, she points to two errors skewing the findings: (1) the ALJ improperly rejected Plaintiff's leg-elevation needs and relied on the VE's mistaken testimony about the DOT; and (2) the RFC did not incorporate Plaintiff's depression and limitations in concentration, persistence, and pace. (*Id.* at 15-16.)

### a.    *Treating Source Opinions*

Certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to

dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion [including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight"). Thus, as the Sixth Circuit has noted, "The treating physician rule also applies to the RFC of the claimant." *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 727 (6th Cir. 2014).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818

F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 661 F.3d at 937. "[A] failure to follow

the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243. If the opinion is not entitled to controlling weight, the ALJ must nonetheless use a six-factor balancing test to determine its probative value. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

#### i.   *Dr. Duncan*

Here, Plaintiff contends the ALJ rejected Dr. Duncan's and Dr. Anwar's opinions without providing "good reasons." (Doc. 12 at 13.) I suggest that substantial evidence supports the ALJ's treatment of both physicians. Regarding Dr. Duncan, Plaintiff does not single out any particular opinion that the ALJ disregarded. (*Id.* at 11-12.) Instead, she seems to take issue with the ALJ's discussion of the evidence in Dr. Duncan's notes. The ALJ "cherry-pick[ed] . . . . strange" and "bizarre statements," which he then "twist[ed] and turn[ed] to somehow paint Plaintiff in a bad light." (*Id.* at 11.) That was, of course, when the ALJ was not simply fabricating "evidence from thin air" or "completely tak[ing] statements out of context." (Doc. 12 at 12.)

As an example of the ALJ's allegedly biased approach, Plaintiff asserts that he "never mentioned" Dr. Duncan's recommendation that Plaintiff needed ankle surgery.

(*Id.* at 11; Tr. at 537.) Plaintiff is mistaken. The ALJ cited to Dr. Duncan's notes, stating, "[W]hile one physician has recommend[ed] arthroscopic surgery ([Exhibit] 12F), two other physicians have not supported this recommendation" and the claimant never underwent the procedure. (Tr. at 27.) Moreover, Dr. Duncan's recommendation was provisional. (Tr. at 535.) He asked Plaintiff to "consider" surgery and noted that if it turned out she had CRPS the surgery might increase those symptoms. (*Id.* at 536-36.) By the next appointment a few months later, Dr. Duncan reversed course and now thought that bracing rather than surgery was the "best option." (Tr. at 533.) Thus the alleged error was no error at all, and the ALJ even understated the evidence against Plaintiff.[4]

Next is a picayune objection to a picayune statement in the ALJ's decision. (Doc. 12 at 11-12.) Plaintiff finds it "beyond the pale" for the ALJ to suggest that her requests for a cane and a brace somehow indicate a less severe medical condition than if a doctor had prescribed them unsolicited. (Doc. 12 at 11; Tr. at 27, 693.) As an initial matter, Plaintiff fails to connect this part of the ALJ's analysis to any of Dr. Duncan's opinions. How Dr. Duncan's opinion appreciates in value by this chain of argument is left unstated.

Moreover, this was not the lone instance the ALJ noted where Plaintiff's requests for medical goods outstripped her need for those goods. (*Id.*) The ALJ cited to the peculiar incident in September 2009 in which Plaintiff rolled out a lengthy list of medical supplies to be filled by the Saginaw Valley Bone and Joint Center. (Tr. at 27, 571.)

---

[4] Plaintiff also objects that the ALJ noted the "significant wear" on her shoes, as observed in Dr. Duncan's notes (Tr. at 533), and found it consistent with reports of her weight loss. (Doc. 12 at 11; Tr. at 27.) She presents no developed argument on the matter, however. The ALJ's deductions might fall short Sherlock Holmes's standards, but they are not clearly inappropriate. *Cf.* Arthur Conan Doyle, *The Five Orange Pips*, reprinted in I *The New Annotated Sherlock Holmes* 133, 136 (Leslie S. Klinger, ed., 2005) ("You have come up from the south-west, I see. . . . That clay and chalk mixture which I see upon your toe-caps is quite distinctive.").

Assuring the Center that the insurance agency had told her the "'sky's the limit,'" she proceeded to request a lift chair recliner, wheelchair, ramp, shower bar, and a toilet seat riser. (*Id.*) Unhappy with the reply that prescriptions were limited to medical necessities, Plaintiff's mother called in acting as Plaintiff's health insurance case manager and threatening to take her business elsewhere unless the items were prescribed. (*Id.*) In light of this situation, the ALJ could justifiably question whether Plaintiff requested only medically necessary goods and services.[5]

Plaintiff also complains of other factual mistakes. The ALJ allegedly relied on an "invalid" MRI to bolster his conclusion. (Doc. 12 at 11.) Plaintiff says that the MRI was deemed "'extremely limited'" because she experienced excruciating pain during it. (*Id.* (quoting (Tr. at 438, 548)).) Perhaps this is a reasonable interpretation of the report, but neither it nor Dr. Duncan's review of it explained why or how it was "limited." (Tr. at 438, 548.) More importantly, the ALJ did not cite the report as unequivocal evidence of Plaintiff's health. Instead, he flagged the findings and then discussed later MRIs showing improvement. (Tr. at 26.) If anything, then, the ALJ treated the MRI as evidence in Plaintiff's favor by suggesting she improved subsequently.

The ALJ also supposedly misinterpreted Dr. Duncan's prescription of a replacement brace. (Doc. 12 at 12.) Plaintiff's references to both the record and the ALJ's decision are unclear. She cites an April 2011 report from Dr. Duncan's office recommending a "[b]race with a lace up shoe. She is still having pain about 3/10 or

---

[5] Plaintiff hints that her insurance required the "ambulatory aid and not that Plaintiff requested it." (Doc. 12 at 11.) She does not cite supporting evidence, or consider the treatment notes' unequivocal statement that "Plaintiff would like to discuss possibly getting a cane to use. . . . [And] [s]he would also like to discuss getting a new brace for stability if possible." (Tr. at 693.)

higher, use crutch or cane in opposite hand. Weight-bear as tolerated, with activity as tolerated. Patient's heavy weight does place more strain on healing foot and ankle." (Tr. at 548.) From this, Plaintiff concludes that she needed the brace due to her "'heavy weight' and not her activity as the ALJ notes." (Doc. 12 at 12.) These treatment notes are ambiguous at best, and in any case the ALJ did not address this specific line in his decision, or suggest that her "activity" led to the brace.

Another of the ALJ's alleged errors was finding that Dr. Duncan's blank function report form "suggests the claimant does not have any work-related limitations." (Tr. at 27; Doc. 12 at 12.) The form in question was nearly blank; it contained only diagnoses. (Tr. at 703-04.) Dr. Duncan did not answer, for example, whether Plaintiff had any physical limitations. (*Id.*) Plaintiff explains that Dr. Duncan left the form blank because "she was unable to assess the limitations without an examination by a physiatrist to determine functional limitations." (Doc. 12 at 12.) The treatment notes Plaintiff cites, however, are more ambiguous: "[Plaintiff] is questioning functional capacity today in the office and we discussed referral to physiatry for functional capacity exam for need for replacement services." (Tr. at 694.) Perhaps the referral was necessary to determine Plaintiff's functioning, but the notes do not clearly support the claim that Dr. Duncan felt incapable of coming to any conclusions without the referral.

Plaintiff falls back upon the implications arising from Dr. Duncan's notes: "There is no evidence from the medical records to suggest that Dr. Duncan's medical opinion was that Plaintiff did not have any work related impairments as the ALJ suggested." (Doc. 12 at 12.) This double negative hardly helps Plaintiff meet her evidentiary burden

34

to prove that she indeed had such impairments. Nor does it demonstrate an error in the ALJ's decision. He could reasonably conclude that the blank form, submitted by a treating physician, "suggest[ed]" Plaintiff had no impairments. (Tr. at 27.) This qualified and tepid interpretation does not indicate undue reliance on this form. Moreover, even if Plaintiff is correct, and Dr. Duncan lacked the capacity to judge her functioning, this fails to help her case. Rather, it undercuts Dr. Duncan by casting her as unprepared to opine on the critical issues in this case.

At the tail end of her paragraph on Dr. Duncan, Plaintiff states, "Further, the ALJ relied more in his decision about lawsuits and evaluation of alleged phone calls made to the orthopedic surgeon for equipment he deemed 'not medically needed' than the actual evidence." (Doc. 12 at 12.) Tellingly, she cites for support only one page out of the ALJ's seventeen-page decision. (Tr. at 29.) On that page, the ALG spent one long sentence on Plaintiff's personal injury litigation, and one similarly lengthy sentence on the phone calls. (*Id.*) As a quantitative matter, then, these issues did not occupy disproportionate space. And the ALJ coupled his analysis of the litigation with the objective evidence, noting that the ongoing lawsuits might explain why Plaintiff's subjective complaints were much more severe than the "normal to mild objective, diagnostic findings reflected within the record." (*Id.*) Moreover, the ALJ's analysis concerns Plaintiff's credibility, not Dr. Duncan's opinion. But Plaintiff does not appear to challenge expressly the credibility findings.

It is true that "the existence of a pending lawsuit alone does not constitute the type of substantial evidence needed to discount a plaintiff's subjective complaints of pain."

*Aronis v. Barnhart*, No. 02 Civ. 7660(SAS), 2003 WL 22953167, at \*7 (S.D. N.Y. Dec. 15, 2003). The ALJ here, however, did not rely exclusively on the pending lawsuits. Nor was his single-sentence analysis comparable to other cases where the ALJ's preoccupation with the outside litigation was deemed improper. *Fortier v. Astrue*, No. 3:10cv01688, 2012 WL 3727178, at \*10-11 (D. Conn. May 11, 2012). There the ALJ's "obsession with Plaintiff's personal injury suit" spanned multiple decisions; even after the court remanded specifically because the ALJ speculated on the litigation, he continued to cite it repeatedly for support. *Id.* at \*11. In the instant case, the lone reference to the outside lawsuit does not suggest a similar "obsession."

Other courts have approved an ALJ's use of such lawsuits as a factor. One court, for example, has rejected claims that a similar analysis displayed bias in the ALJ's credibility determination. *See Williams v. Comm'r of Soc. Sec.*, 679 F. Supp. 2d 664, 701 (N.D. W.Va. 2010) (adopting Report & Recommendation) ("While the ALJ's comments do indicate a skepticism regarding Claimant's filing for SSI, his comments regarding Claimant's work history and pending legal actions do not 'display a deep-seated favoritism or antagonism that would make fair judgment impossible." (citation omitted)). The Eight Circuit has gone further, agreeing with the ALJ that ancillary litigation could demonstrate a motive for exaggerating subjective complaints. *Gaddis v. Chater*, 76 F.3d 893, 895-96 (8th Cir. 1996); *see also Baker v. Barnhart*, No. 02 C 3195, 2003 WL 2105844, at \*9 (N.D. Ill. 2003) ("At least one other court has recognized that in some circumstances it may be proper to consider a claimant's other litigation as evidence of secondary motive for exaggerating symptoms or pursuing disability insurance benefits.");

*cf. James-Parker v. Comm'r of Soc. Sec.*, No. 1:11-cv-1236, 2013 WL 1150593, at *6 (W.D. Mich. Mar. 19, 2013) (upholding the ALJ's credibility analysis, which discounted the plaintiff's testimony because she gave "evasive" answers "regarding her history of claims and lawsuits related to long term disability, workers compensation and no-fault insurance"). Here, the ALJ could properly discount Plaintiff's credibility due to the incentives provided by pending litigation, especially when the objective evidence supported that assessment. The issue was not central to the credibility assessment, which Plaintiff does not directly attack. Plaintiff's underdeveloped argument thus fails to persuade.

### ii.     Dr. Anwar

Plaintiff next turns to the ALJ's analysis of Dr. Anwar. (Doc. 12 at 12-13.) She contends that the ALJ provided one insufficient reason for rejecting the physician's opinion: that it was completed for a state benefit program that "is designed to assist the claimant in obtain[ing] medical insurance coverage, which renders it inherently biased."[6] (Tr. at 31.) According to Plaintiff, this fails to provide "good reasons" under 20 C.F.R. § 404.1527(c) for rejecting a treating source opinion. (Doc. 12 at 13.) Defendant admits that "the ALJ's inference . . . is too thin a reed on which to rest an outright rejection of a treating medical source opinion." (Doc. 14 at 12.)

The ALJ erred by not demonstrating he considered the required factors when weighing the opinion. *See* 20 C.F.R. § 404.1527(c). Even if the form's questionable

---

[6] Plaintiff does not appear to take issue with the ALJ's handling of Dr. Anwar's second opinion, to which he gave little weight because it only addressed "medication side effects" and not a "function by function assessment." (Tr. at 31.)

provenance was relevant, the ALJ still failed to explain why this fact outweighed other considerations. Nor did he did he examine how the nature of the state benefits application would skew Dr. Anwar's findings or why Dr. Anwar's answers on it would be any different than if he submitted an opinion for a Social Security disability application. The single reason the ALJ gave cannot support his conclusion.

I suggest, however, that the error does not merit remand, but is instead among the narrow class of harmless mistakes made when rejecting a treating source opinion. Generally, as Judge Richard Posner put it, "If it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support, then remanding is a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). Yet finding harmless error when an ALJ bungles the treating opinion analysis is a rare occurrence.

The Sixth Circuit employs a "circumscribed form of harmless error review . . . [in] the context of the reasons-giving requirement of [20 C.F.R.] § 404.1527(d)(2)." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 656 (6th Cir. 2009). This test stems from *Wilson v. Commissioner of Social Security*. In that case, the ALJ did not give "good reasons" for the weight he provided a treating physician's opinions. 378 F.3d at 545. The court refused to brush this off as harmless because the "good reasons" regulation conferred a substantial procedural protection. *Id.* at 546-47. The error would not be overlooked "simply because . . . there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely." *Id.* at

546. This is particularly true when there are no medical opinions contradicting the erroneously rejected treating source. *See Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 862 (6th Cir. 2011).

The *Wilson* court offered three potential grounds for harmless errors in this context: (1) where the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) where the ALJ adopted the opinion or made findings consistent with it, or (3) where the ALJ "met the goal of § 1527(d)(2)." *Wilson*, 378 F.3d at 547. These conditions do not leave much room for finding harmless error. *See, e.g.*, *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 552 (6th Cir. 2010) (refusing to find harmless error where the ALJ "discussed no opinions contrary to that of [the rejected treating source] other than that of the reviewing physician").

However, the Sixth Circuit's opinion in *Heston v. Commissioner of Social Security*, provides another type of harmless error. 245 F.3d 528 (6th Cir. 2001). There, the ALJ failed to discuss a treating physician's three-page summary of the claimant's medical history. *Id.* at 535. The court offered various reasons for finding the error harmless, including the report's lack of supporting objective evidence and its genesis prior to the disability onset date *Id.* at 535-36. The final consideration was that the ALJ posed a hypothetical to VE incorporating the physician's limitations and the VE "concluded that there were jobs in the area, taking into consideration[] the limitations, that could be performed." *Id.*

Nearly the same exchange occurred at the hearing here. The ALJ's penultimate hypothetical incorporated all of the restrictions eventually listed in the RFC. (Tr. at 76.)

The VE responded not by proposing "light work" jobs but rather "sedentary" jobs, including positions as a ticket seller, information clerk, and security monitor.[7] (Tr. at 76-77.) The VE's classification of these positions as "sedentary" is critical. Such work "involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). The specific job descriptions in the DOT also provide that each job requires lifting ten pounds occasionally.[8] Dr. Anwar's opinion easily fits within the "sedentary" classification. As a result, all the positions the VE offered in response to the relevant hypothetical could be performed by someone laboring under Dr. Anwar's restrictions. And these were the only positions the ALJ's decision cited to demonstrate that Plaintiff could be gainfully employed. (Tr. at 34.) Consequently, the already slight difference between the RFC and the opinion disappears altogether in the VE's testimony. In other words, the error was harmless.

### iii.    Miscellany

Tucked at the end of her treating source argument are two brief contentions bearing little relation to the treating physician rule. First, she gripes that "Dr. Kushner is a DDS examiner physician who was paid to deny claimant's claim for Social Security and

---

[7] Each job has a specific DOT number, and the VE provided those numbers along with the title. (Tr. at 76-77.) The number she gave for the "information clerk" position does not match that title, but rather belongs to the "call-out operator" position. DOT, *Call-Out Operator*, 237.367-014 , 1991 WL 672186 (4th ed. 1991). The difference is immaterial because both positions are "sedentary," requiring only occasional lifting up to ten pounds. *Id*; DOT, *Information Clerk*, 237.367-022, 1991 WL 672188.

[8] *See* DOT, *Call-Out Operator*, 237.367-014 , 1991 WL 672186 ("Exerting up to 10 pounds of force occasionally (Occasionally: activity or condition exists up to 1/3 of the time) and/or a negligible amount of force frequently (Frequently: activity or condition exists from 1/3 to 2/3 of the time) to lift, carry, push, pull, or otherwise move objects."); DOT, *Parimutuel-Ticket Checker*, 219.587-010, 1991 WL 671989 (same); DOT, *Surveillance-System Monitor*, 379.367-010, 1991 WL 673244 (same).

never examined the Plaintiff. Hardly, could Dr. Kushner be considered a neutral third party." (Doc. 12 at 14.) Actually, that is exactly what the regulations and the Sixth Circuit would call him. According to the regulations, "State agency medical and psychological consultants and other program physicians . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(d)(2)(i). The Sixth Circuit has observed that "reviewing physicians" hired by the state agency "have the strongest claims to neutrality." *Lucido v. Barnhart*, 121 F. App'x 619, 622 (6th Cir. 2005); *see also Richardson*, 402 U.S. at 403 ("The vast workings of the social security administrative system make for reliability and impartiality in the consultant reports."). Simply giving "greater weight to state agency physicians over [Plaintiff's] treating sources [is] not, by itself, reversible error." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009). Even if Plaintiff had demonstrated the possibility of bias, she has not shown how it prejudiced the findings. Her only contention is that the ALJ "blindly" adopted Dr. Kushner's RFC "but [did] not elicit any light skilled work from the vocational expert." (Doc. 12 at 14.) The vocational-skill level had nothing to do with Dr. Kushner, who evaluated her medical condition, not her vocational capabilities.

Finally, Plaintiff argues that the ALJ never evaluated "whether claimant is capable of a competitive work schedule i.e., 8 hour day, 40 hour work week," as required by Social Security Ruling ("SSR") 96-8p. (*Id.*) That ruling requires ALJs to "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work

schedule)." SSR 96-8p, 1996 WL 374184, at *7 (citation omitted). The RFC, however, "is the individual's *maximum* remaining ability to do sustained work activities in an ordinary setting on a regular and continuing basis," which is a forty-hour work week. *Id.* at *2 (emphasis omitted). The evaluation of a claimant's physical and mental abilities aims to "assess the nature and extent of [the claimant's] physical limitations and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(b). Thus, generally, the RFC implicitly encompasses this finding, *see Mynhier v. Astrue*, No. 10-cv-037, 2010 WL 3245394, at *7 (E.D. Ky. Aug. 16, 2010), although some courts hold that the ALJ must still explain his or her reasoning. *See Stanfield v. Colvin*, No. 2:12-cv-213, 2013 WL 3935071, at *6-7 (E.D. Ky. July 30, 2013)

Most courts do not require any discussion. Instead, they find that an RFC implicitly includes the determination on whether the claimant can sustain a regular work schedule. As one explained, "Generally, such a finding is implicit. There is no requirement to make an explicit 'regular and continuing basis' finding evidence of a waxing and waning nature of the claimant's symptoms." *Thomas v. Comm'r of Soc. Sec.*, No. 1:03-CV-925, 2005 WL 588752, at *6 (E.D. Tex. Jan. 3, 2005).[9]

---

[9] *See also Beckham v. Colvin*, No. 8:13-2774, 2015 WL 733785, at *11 (D. S.C. Feb. 20, 2015) ("Thus, the RFC is, by definition, an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis."); *Bowers v. Colvin*, No. 11-40229, 2014 WL 3530781, at *10 (D. Mass. Mar. 12, 2014) (noting that there is no requirement the ALJ explicitly make this determination and finding that the ALJ implicitly made the finding), *Report & Recommendation adopted by* 2014 WL 3530797 ("The record evidence establishes the ALJ *implicitly* considered Bowers's ability to sustain her activities."); *Raley v. Astrue*, No. 2:11cv555, 2012 WL 2368609, at *6 (M.D. Ala. June 21, 2012) ("Thus, in creating a RFC assessment for Plaintiff, the ALJ has implicitly reached a determination on whether or not Plaintiff can perform those work activities during an eight-hour day."); *Ramirez ex rel. Zetino v. Astrue*, No. 10-CV-03522, 2012 WL 372011, at *22 n.31 (E.D. N.Y. Feb. 3, 2012) ("Thus, in determining that Zetino retained the capacity to

Many other courts give the ALJs significant leeway in satisfying this ruling. The Fourth Circuit has found that an RFC limiting the claimant to a "'a wide range of sedentary work" at production rate or simple tasks "implicitly contained a finding that Mr. Hines physically is able to work an eight hour day." *Hines v. Barnhart*, 453 F.3d 559, 563 (4th Cir. 2006). Likewise, the Fifth Circuit has held that an "ALJ's determination that [the claimant] had the RFC to perform sedentary work is a determination that he is able to sustain work-related activities on a 'regular and continuing basis'" under the SSR 96-8p. *Pekrul v. Barnhart*, 153 F. App'x 329, 332 (5th Cir. 2005); *see also Dunbar v. Barnhart*, 330 F.3d 670, 672 (5th Cir. 2003) (holding that the ALJ did not need to make "a specific finding that the claimant can maintain employment" where there was no evidence that this ability was "compromised despite [the claimant's] ability to perform employment as an initial matter" and no "indication that the ALJ did not appreciate that

---

'perform the full range of light work . . .' the ALJ implicitly found that Zetino could perform such work on a sustained basis."); *Ricks v. Comm'r of Soc. Sec.*, No. 2:09cv622, 2010 WL 6621693, at *14 (E.D. Va. Dec. 29, 2010) (Report & Recommendation) ("As defined, any assessment of a claimant's RFC is necessarily an assessment of the claimant's ability to work a forty-hour week."); *Mynhier*, 2010 WL 3245394, at *7 (noting SSR 96-8p's definition of RFC and concluding, "Thus, implicit in an ALJ's RFC finding was the ALJ's determination that [the claimant] could perform light work on a 'regular and continuing' basis and not merely for a short period of time"); *Clark v. Astrue*, No. C09-5342, 2010 WL 842322, at *9 (W.D. Wash. Mar. 8, 2010) (adopting Report & Recommendation) ("It is axiomatic that the residual functional capacity finding is inherently an assessment of a claimant's ability to perform ongoing work."); *Porter v. Astrue*, No. 08-CV-33, 2009 WL 2595562, at *15 (D. Ore. Aug. 19, 2009) (adopting Report & Recommendation) ("Because Porter did not explain his argument, this court relies upon a plain reading of SSR 96-8p and finds that the ALJ implicitly considered Porter's ability to work eight hours per day, five days per week."); *but see Martin v. Astrue*, No. 6:08-3006, 2010 WL 890064, at *10 (D. S.C. Mar. 8, 2010) (noting the contrary authority, binding authority from the Fourth Circuit but simply holding, without elaboration, that those cases "do[] not excuse the ALJ's failure to comply" with the Ruling); *Brodbeck v. Astrue*, No. 5:05-CV-0257, 2008 WL 681905, at *8 (N.D. N.Y. Mar. 7, 2008) (remanding where the ALJ's only acknowledgement of the workday limitation came by giving great weight to a medical source's opinion concerning how much the claimant could lift in a normal day); *Mardukhayev v. Comm'r of Soc. Sec.*, No. 01-CV-1324, 2002 WL 603041, at *6 (E.D. N.Y. Mar. 29, 2002) ("In addition, I conclude that the ALJ did not determine, explicitly or implicitly, whether the claimant had the capacity to work on a 'regular and continuing basis.'").

an ability to perform work on a regular and continuing basis is inherent in the definition of RFC").

Even courts demanding more thorough discussions have allowed broad assertions in the decision to fulfill this requirement. In *Stanfield v. Colvin*, the court held that the ALJ "must still explain [his or her] determination" that the claimant can perform full-time work. 2013 WL 3935071, at *6-7. Nonetheless, it was sufficient that the ALJ mentioned the claimant's part-time work, he "regurgitated" a doctor's assessment and other third-party statements, and the plaintiff pointed "to no additional evidence to suggest she could not perform in the limited capacity the RFC details on a full-time basis." *Id.* Similarly, in *Scott v. Commissioner of Social Security*, the ALJ's consideration of the claimant's "past experience with various ailments" and his references to an eight-hour work day sufficed to meet the Ruling. No. 11-13545, 2012 WL 4178844, at *3-4 (E.D. Mich. Sept. 19, 2012).

The RFC here sufficiently demonstrates the ALJ's finding that Plaintiff can work on a regular schedule. The ALJ's decision defines the RFC as the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments." (Tr. at 20.) "[S]ustained basis" suggests that the ALJ considered Plaintiff's capacity to work for an extended period. Moreover, in that discussion, he cited 20 C.F.R. § 404.1520(e), which in turn references § 404.1545, the provision establishing the "regular and continuing basis" requirement. (Tr. at 20.) He also cited the Ruling at issue here, SSR 96-8p. (Tr. at 20, 24.) *Cf. Dunbar*, 330 F.3d at 672 (noting that the ALJ cited the regulation, suggesting he considered the claimant's ability to maintain employment);

*Clark*, 2010 WL 842322, at *9 (same). At the hearing, the ALJ frequently mentioned the standard workday. (Tr. at 76-77.) For example, he asked the VE whether forty-minutes of additional breaks in an eight-hour day would preclude employment (Tr. at 77.)

More importantly, the RFC references her ability to "stand or walk for two hours of a standard eight hour workday." (Tr. at 24.) It also states that Plaintiff must "be allowed to elevate her right foot at any level necessary for two hours in a standard, eight-hour work period." (Tr. at 25.) *Cf. Scott*, 2012 WL 4178844, at *3-4. The ALJ was plainly considering her ability to maintain a normal work schedule, and he offered reasons why she could. The RFC's references to a "standard" workday more directly address SSR-96-8p than either of the ALJs' decisions in *Hines* and *Pekrul*. Further, Plaintiff offers no plausible evidence indicating she could not maintain employment once begun. *Cf.* Dunbar, 330 F.3d at 672; *Porter*, 2009 WL 2595562, at *15. The only possible limitation affecting her ability to endure a normal schedule is her alleged need to raise her ankle for four to six hours per day (Doc. 12 at 15). But as discussed below, the ALJ properly rejected this contention. Therefore, I suggest that he did not need to type out "forty hours per week" alongside his references to "a standard, eight-hour work period."

      **b.**     ***The RFC***

            **i.**    *Leg Elevation and Vocational Evidence*

Plaintiff next contends that the RFC did not accurately portray her impairments. (Doc. 12 at 14.) First, she claims that the ALJ did not "factor" into his RFC all the severe impairments he found at step two. (*Id.* at 15.) It seems that the only result of this error, at least the only one Plaintiff flags, is that the RFC allotted her two hours of leg elevation

per day rather than the four to six she claimed to need. (*Id.*) The only evidence she adduces is her hearing testimony. (*Id.*); (Tr. at 48-50.) Finally, she states, "The ALJ points to no medical records for his rejection that Plaintiff needs to elevate her legs for 4-6 hours per day." (Doc. 12 at 15.)

If the ALJ pointed to no such records, it was for the same reason Plaintiff does not: none exist demonstrating her need to raise her leg for a shorter length of time because none exist demonstrating her need to raise her leg at all. A 2011 note from Dr. Duncan states, "[Plaintiff] does notice swelling all the time, it increases with activity, elevation does help." (Tr. at 535.) Other than this statement, apparently coming from Plaintiff herself, the record scarcely mentions leg elevation. Despite the lack of "objective support" for this limitation, the RFC nonetheless accommodated Plaintiff by allowing her to raise the leg for two hours per day. (Tr. at 24, 32.)

The Sixth Circuit has addressed a similarly "bald claim" that an RFC's allowance of two hours of leg elevation per day was not enough. *Morris v. Barnhart*, 223 F. App'x 465, 468 (6th Cir. 2007). There, as here, the claimant propped his claim upon little more than his own testimony and his doctors' observations of discoloration when he stood. *Id.* The court stated, "Nowhere in [the doctors'] reports do they detail for how long, at what elevation, or even whether elevating the feet at all would improve Morris'[s] condition." *Id.* He stood and walked "in a number of [his] daily activities," including when he cleaned his house. *Id.* The court consequently upheld the ALJ's findings.

For many of the same reasons, substantial evidence supports the ALJ here. With no evidence bolstering Plaintiff's testimony, the ALJ was entitled to discredit it. He gave

several valid grounds for questioning her general allegations, including her pending related lawsuits, the decreasing frequency of her doctor visits, her exercise and weight loss, her inconsistent work history, and her self-employment earnings after the alleged onset date. (Tr. at 28-32, 143, 243-44, 533.) Like the claimant in *Morris*, Plaintiff could leave the house and do light housekeeping, such as vacuuming, mopping, sweeping, and dusting. (Tr. at 179-80.) With help, she cared for a dog and two birds, and sometimes could take on even more physically demanding tasks like "mov[ing] out couches, washing walls, mowing, raking, [and] shoveling snow."[10] (Tr. at 180.) This establishes substantial evidence supporting the ALJ's determination.

Plaintiff is not done, however, with the leg elevation argument. After "scour[ing]" the DOT, Plaintiff questions whether it is consistent with the VE's testimony, as the VE claimed it was at the hearing. (Doc. 12 at 15-16; Tr. at 75.) Nothing in the DOT's job descriptions mentions leg elevation, Plaintiff observes. (*Id.*) She does not connect this observation to any relevant law, but clearly she means to undercut the vocational evidence.

"'Substantial evidence may be produced through reliance on the testimony of a vocational exert in response to a "hypothetical" question'" if the question accurately describes the claimant. *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) (quoting *Varley v. Sec'y of Human Health Servs.*, 820 F.2d 777, 779 (6th Cir.

---

[10] "The court may consider evidence in the record, regardless of whether it has been cited by the ALJ." *Blackburn v. Comm'r of Soc. Sec.*, No. 4:11-cv-58, 2012 WL 6764068, at *5 (E.D. Tenn. Nov. 14, 2012) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir.2001)), *Report & Recommendation adopted by* 2013 WL 53980, at *1 (E.D. Tenn. Jan. 2, 2013). The analysis above merely plugs additional facts into the ALJ's analysis, it does not construct new rationales or arguments for the ALJ's action.

1987)). Plaintiff does not say, in this portion of her argument at least, that the hypothetical failed to correctly depict her impairments. Instead, the issue she raises revolves around the DOT. According to SSR 00-4p, "When a VE provides evidence, it 'generally should be consistent with . . . the DOT.'" *Moran v. Comm'r of Soc. Sec.*, 40 F. Supp. 3d 896, 929 (E.D. Mich. 2014) (quoting SSR 00-4p, 2000 WL 1898704, at *2). But while Plaintiff hints that the two are inconsistent, she does not point out how. True, none of the DOT job descriptions for the three positions invite workers to put their legs up during the workday. But none explicitly prohibit it either.

SSR 00-4p's consistency requirement is designed to address what the ALJ must do "[w]hen there is an apparent unresolved conflict between VE . . . evidence and the DOT." 2000 WL 1898704, at *2. As Defendant recognizes, however, "where . . . the DOT is silent about specific demands of a particular job, a VE's testimony filling in the gaps does not raise a conflict." (Doc. 15 at 24.) *See also Hynes v. Barnhart*, No. 04CV490SM, 2005 WL 1458747, at *5 (D. N.H. June 15, 2005) ("Here the vocational expert simply applied his expertise and provided the ALJ with information that was not provided in the DOT. Contrary to claimant's assertion, there was no 'conflict' between the vocational expert's testimony and the data provided by the DOT.").

Because the positions do not expressly prohibit leg elevation, they could only "conflict" with this limitation if one of their required work activities would naturally preclude it. Within the DOT descriptions, the only apparent activities that could preclude leg elevation would be standing and walking. Each of the positions requires standing and

walking occasionally, or up to one-third of the eight-hour workday.[11] This means the worker will stand or walk for roughly 2 hours and 45 minutes per day. And this leaves 5 hours and 15 minutes for sitting, during which the worker could presumably raise at least one leg. Thus the leg elevation requirement does not conflict with the DOT. Other courts have held likewise. *See Creque v*. Astrue, No. 4:10-CV-1528, 2011 WL 4054859, at *6 (N.D. Ohio Aug. 18, 2011) ("Thus, the Court finds that the VE's Testimony regarding occupations permitting an individual to periodically raise his legs is not contradictory to the DOT, but rather augments the data provided in the DOT."), *Report & Recommendation adopted by* 2011 WL 4043786, at *1 (N.D. Ohio Sept. 12, 2011). Without any guidance from the Plaintiff on other potential conflicts, the Court is unable determine that the VE's testimony conflicted with the DOT.

But even if it did, "the plaintiff has not pointed to any authority that the ALJ erred in his findings based on the VE's testimony, which went unchallenged by the plaintiff until after the ALJ issued his decision." *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009). The DOT does not bind either the ALJ or the VE. *Id.* (quoting *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003)). Nor must the ALJ scour the DOT after the hearing to determine whether the VE's testimony matched it. *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009). It suffices under SSR 00-4p for the ALJ to ask the VE at the hearing if his or her testimony conflicts with the DOT. *Id.*; *see also Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) ("Nothing

---

[11] *See* DOT, *Call-Out Operator*, 237.367-014 , 1991 WL 672186; DOT, *Parimutuel-Ticket Checker*, 219.587-010, 1991 WL 671989; DOT, *Surveillance-System Monitor*, 379.367-010, 1991 WL 673244.

in SSR 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct."). The ALJ here did that four times, after each hypothetical. (Tr. at 74, 76-77.) In doing so, he satisfied his obligations under SSR 00-4p.

### ii.   *Concentration, Persistence, and Pace*

Plaintiff's final substantial argument is that the RFC and hearing hypotheticals do not "mention" or "factor" Plaintiff's "depression and moderate limitations in concentration, persistence, or pace" found at Step Three. (Doc. 12 at 16.) At that step, the ALJ found Plaintiff had moderate difficulties with concentration, persistence, or pace. (Tr. at 24.) In the RFC, Plaintiff is limited to "unskilled" work. (*Id.*) Plaintiff's argument consists of a series of sentences each stating that the ALJ never "factor[ed]," "mention[ed]," or "include[d]" Plaintiff's concentration problems in the hypothetical or the RFC. (Doc. 12 at 16.) Along with these allegations, Plaintiff cites two cases for the proposition that the hypothetical must incorporate a claimant's impairments. (*Id.* (quoting *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010); *Green v. Comm'r of Soc. Sec.*, No. 08-11398, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009))). How did the RFC and hypothetical fail to encompass these concentrational difficulties? Plaintiff offers a single non-conclusory sentence, citing no medical evidence: "The medical records demonstrate Plaintiff has severe memory problems, fatigue, and severe pain." (*Id.*)

Plaintiff's argument is "not uncommon and the case law resolves it both ways." *Hernandez v. Comm'r of Soc. Sec.*, No. 10-cv-14364, 2011 WL 4407225, at *9 (E.D. Mich. Aug. 30, 2011) (collecting cases). The *Hernandez* court stated that

> a hypothetical simply limiting a claimant to unskilled work may, in some instances, fail to capture a claimant's moderate limitation in concentration, persistence, or pace . . . . However, the Court also finds that there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of, for example, "unskilled work" but excludes a moderate limitation in concentration. Rather, this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's hypothetical and RFC assessment.

*Id.* at *10 (citations omitted). In some cases courts will remand when an ALJ's "hypothetical does not include a specific reference to moderate limitations in concentration or pace and only limits the hypothetical individual to unskilled work or simple, routine tasks," but "other cases have found that an ALJ formed an accurate hypothetical by limiting the claimant to unskilled work and omitting a moderate concentration or pace limitation." *Taylor v. Commissioner of Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011), *Report & Recommendation adopted*, No. 10-12519, 2011 WL 2682892 (E.D. Mich. July 11, 2011). "[T]here is no bright-line rule requiring remand" in these circumstances. *Roberts v. Comm'r of Soc. Sec.*, No. 10-cv-14064, at *8 (E.D. Mich. Aug. 8, 2011), *Report & Recommendation adopted by* 2011 WL 4406344, at *1 (E.D. Mich. Sept. 22, 2011). Instead, "this Court must look at the record as a whole and determine if substantial evidence supports the ALJ's decision." *Id.*

In this case, the "unskilled" designation adequately reflects the rather meager evidence of mental health problems. The ALJ explained that Plaintiff had not received consistent specialized mental health treatment. (Tr. at 29.) He also pointed to the unremarkable results from two neuropsychological examinations. (Tr. at 30, 402-07, 507-

18.) During the first, with Dr. MacInnes, Plaintiff "denied losing her train of thought or misplacing things more often than in the past and she felt that '[her] memory is still intact.'" (Tr. at 402.) In the testing, she "was able to maintain the purpose throughout each test" and "enjoyed working at a rapid pace and also seemed to enjoy the challenge that many of the tests presented." (Tr. at 404.) Indeed, she "preferred to work at a steady, slightly hurried pace and performed quite well." (*Id.*) Her conversation was pleasant and "she was easily redirected to testing and remained focused throughout the tasks." (*Id.*)

With observations like these, it is no surprise that Dr. MacInnes made the following findings: her "basic attention span on the auditory modality fell in the above-average to superior range," her ability to sustain auditory attention was average, her mental speed and calculations "in the auditory modality" were above average, and her sustained visual attention-span for brief period was above average. (Tr. at 405.) Only on "less engaging" tasks did she have "mild difficulties" with visual attention. (*Id.*) Her problems-solving skills and abstract thinking were "average-to-above average," and overall her intellectual functioning fell "in the average range." (*Id.*) In his summary, Dr. MacInnes concluded that the results were generally normal, and that she did not have significant cognitive deficits. (Tr. at 406.) This report, then, does not support Plaintiff's argument.

Dr. Greiffenstein's neuropsychological report confirms these findings. (Tr. at 507-18.) Her main complaint at that session was physical pain; "she [did] not really think there is anything wrong with her mind." (Tr. at 508.) She stated that her memory and concentration waned "when she experience[d] great pain," but returned to normal "with

52

relatively less pain." (*Id.*) One of her favorite daily activities was reading magazines, and she could "maintain vigilance over long periods of time" when reading. (*Id.*) Regarding her depression, she "was uncertain why she never sought mental health care," referring particularly to the period before the accident. (Tr. at 509.) Dr. Greiffenstein thought her "attention and concentration were normal" during conversation, and she could easily be redirected on topic. (Tr. at 512.) Overall, her performance on neuropsychological tests "was in the superior range." (Tr. at 513.) Her memory and "learning" were normal in most aspects and superior in others. (Tr. at 514-15.) Concluding, the doctor wrote, "There is no objective evidence for cognitive impairment, even though Ms. Trischler reports widespread cognitive concerns on a subjective basis." (Tr. at 515.) Like the other report, these findings do not aid Plaintiff's cause.

Further, Plaintiff's self-reported hobbies suggest a greater ability to concentrate. (Tr. at 182.) Among these, she searches for coupons weekly, uses social media, and plays Scrabble, although only a few times a year. (*Id.*) Further, as the ALJ noted, Plaintiff reported being able to follow recipes, assemble toys, and follow instructions if given reminders. (Tr. at 24, 183.) These are certainly not strong indications of her ability to concentrate, but when added to the neuropsychological reports and weighed against countervailing evidence, which is almost entirely subjective (Tr. at 53, 60, 77-78, 183), they give further support to the ALJ's decision. Moreover, her depression seemed well-controlled with medication. (Tr. at 29, 486, 492, 493, 624.)

The evidence, taken as a whole, simply does not demonstrate significant problems with concentration, persistence, or pace. *Cf. Roberts*, 2011 WL 4407221, at *8. All the

objective testing of these functions, described above, displayed normal results. The only medical evidence suggesting any concentrational issues was from reviewing psychologist Dr. Wayne Hill, who found "mild" problems (Tr. at 85), and from Mr. Kozicki, who wrote without explanation that Plaintiff had "some trouble thinking." (Tr. at 624.) It is unclear whether this latter observation came from Plaintiff or Mr. Kozicki. In any case, these two statements do not overcome the intricate and extensive testing by examining experts noted above. Moreover, Plaintiff fails to offer the Court any guidance on how her mental problems manifested or what additional limitations the RFC should include. Absent such guidance, the Court cannot say that the ALJ erred by only limiting her to unskilled work.

### c.   Waived Arguments

Plaintiff implies two additional arguments in her brief, but I suggest she waived both. At the end of Plaintiff's paragraph dealing with leg elevation, she plants an unrelated, single-sentence argument: "The ALJ does not evaluate Ms. Trischler's pain, medication side effect or any other symptoms whatsoever in his decision." (Doc. 12 at 16.) The ALJ did discuss her pain and medication side effects (Tr. at 28, 31), and spent about nine pages evaluating the medical evidence of her "symptoms." (Tr. at 25-33.) The decision dealt with little else. Aside from being inaccurate, Plaintiff's contention is fatally undeveloped. *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that . . . arguments adverted to in only a perfunctory manner, are waived."). I suggest that she has waived this argument.

On the last page of her brief, Plaintiff provides an extensive block quote from SSR 96-8p, which requires the RFC assessment to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence." SSR 96-8p, 1996 WL 374184, at *7. Beneath the quote, she appends her argument: "Curiously, the ALJ never complied or even attempted to reconcile Social Security Ruling 96-8p with his decision." (Doc. 12 at 17.) Thus begins and ends the argument. Again, the ALJ's extensive discussion analytically engaged the evidence, weighed it, and found Plaintiff's claims lacking. Her citation to SSR 96-8p and conclusory remark do not provide a reason to find otherwise. Therefore I suggest that this argument, too, has been waived.

### G.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is supported by substantial evidence.

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United*

*States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.


Date: August 19, 2015                         S/ PATRICIA T. MORRIS
                                              Patricia T. Morris
                                              United States Magistrate Judge

## **CERTIFICATION**

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: August 19, 2015                    By s/Kristen Krawczyk
                                         Case Manager to Magistrate Judge Morris